**REVERSE and RENDER; and Opinion Filed June 17, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00798-CV

### SUZLON ENERGY LIMITED, Appellant
### V.
### TRINITY STRUCTURAL TOWERS, INC., Appellee

**On Appeal from the 101st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-12-00094**

## OPINION

Before Justices O'Neill, Lang-Miers, and Evans
Opinion by Justice Lang-Miers

This is an interlocutory appeal from the trial court's order denying a special appearance filed by appellant Suzlon Energy Limited, a company organized under the laws of India with its principal place of business in Pune, India (Suzlon India). We conclude that Suzlon India is not amenable to specific jurisdiction in this case. As a result, we reverse the trial court's order and render judgment dismissing Suzlon India from this case for lack of personal jurisdiction.

### BACKGROUND

This case arises from an agreement between appellee Trinity Structural Towers, Inc., a Delaware corporation with its principal place of business in Dallas, Texas, and Suzlon Wind Energy Corporation, a Delaware corporation with its principal place of business in Chicago, Illinois (Suzlon Wind). Suzlon Wind is an indirect subsidiary of Suzlon India.

Trinity manufactures wind towers for use in the wind energy industry. In 2008, Trinity entered into an agreement with Suzlon Wind under which Trinity agreed to manufacture, and Suzlon Wind agreed to purchase, 900 80-meter wind towers at a rate of at least 300 per calendar year for three years beginning in 2009 (the Tower Agreement). Suzlon Wind later sought to modify and defer its purchase obligations under the Tower Agreement. As a result, the parties revised the Tower Agreement twice, ultimately extending the term through 2013 and increasing to 1,200 the total number of towers to be manufactured and purchased. Under the second revision, effective January 14, 2010, Suzlon Wind agreed to purchase a total of 207 towers in 2010, 236 towers in 2011, 300 towers in 2012, and 300 towers in 2013. Instead, Suzlon Wind purchased 59 towers in 2010 and instructed Trinity not to manufacture any additional towers.

## PROCEDURAL HISTORY

Trinity sued Suzlon Wind for breach of contract. Suzlon Wind filed an answer and asserted counterclaims. Trinity amended its petition to add Suzlon India as a defendant, asserting alternative claims against Suzlon India for breach of contract, tortious interference with contract, and promissory estoppel.[1]

Suzlon India filed a verified special appearance challenging the trial court's personal jurisdiction. Suzlon India's special appearance was supported by the affidavit of Nishith Shekdar, the president of Towers Vertical, a department of Suzlon India. Trinity filed a response to Suzlon India's special appearance. Trinity's response was supported by (1) the affidavit of Kerry Cole, Trinity's president, (2) certain documents referenced in Cole's affidavit, (3) excerpts from the deposition of John Hewitt, the chief operating officer of Suzlon Wind, and (4) excerpts

---

[1] In its amended petition Trinity labelled its causes of action as "counts," and also listed two other "counts"—"alter ego" and "agency." But those two "counts" were theories of liability relating to the breach-of-contract claim, not separate causes of action. In its appellee's brief Trinity acknowledges that it sued Suzlon India "for breach of contract, tortious interference with contract and promissory estoppel."

from the deposition of Niels Winther, general manager of Suzlon Wind.  Suzlon India and Trinity also filed a reply and sur-reply, respectively.

After a non-evidentiary hearing at which both sides presented argument, the trial court signed an order denying Suzlon India's special appearance.  At the request of Suzlon Wind and Suzlon India, the trial court issued findings of fact and conclusions of law in support of its order, in which it specified that the basis for its ruling is that Suzlon India has sufficient minimum contacts with Texas to support the trial court's exercise of specific jurisdiction.[2]

## BURDEN OF PROOF AND STANDARD OF REVIEW

The plaintiff bears the initial burden to plead sufficient allegations to bring the nonresident defendant within the reach of Texas's long-arm statute. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010). Once the plaintiff meets this burden, the defendant assumes the burden to negate all bases of personal jurisdiction alleged by the plaintiff. *Id.*

Whether a court has personal jurisdiction over a defendant is a question of law. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002).  In resolving this question of law, however, a trial court must frequently resolve questions of fact.  *Id.*  If a trial court issues findings of fact and conclusions of law in connection with its ruling on a special appearance, the appellant may challenge the fact findings on legal and factual sufficiency grounds. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).  The trial court's legal conclusions are reviewed de novo.  *Id.*

---

[2] In the trial court Trinity also alleged that Suzlon India was subject to general jurisdiction.  The trial court disagreed and concluded that Suzlon India was amenable only to specific jurisdiction.  On appeal Trinity does not argue that Suzlon India is subject to general jurisdiction.  We confine our analysis to the trial court's conclusion that Suzlon India is amenable to specific jurisdiction.

–3–

## PERSONAL JURISDICTION

The Texas long-arm statute reaches as far as due process allows. *Lensing v. Card*, 417 S.W.3d 152, 155 (Tex. App.—Dallas 2013, no pet.). Accordingly, a Texas court may exercise personal jurisdiction over a nonresident defendant if (1) the defendant has minimum contacts with Texas and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.*

The minimum-contacts test focuses on the question of whether the defendant has purposefully availed itself of the privilege of conducting activities in the forum state. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). Three principles guide the minimum-contacts analysis. *Lensing*, 417 S.W.3d at 155. First, we must disregard any forum contacts by the defendant that resulted solely from the unilateral activity of another party or a third person. *Id.* at 156. Second, the defendant's contacts with the forum state must be purposeful rather than random, isolated, or fortuitous. *Id.* And third, the defendant must have sought some benefit, advantage, or profit from its forum-directed activities and invoked the benefits and protections of the forum's laws. *Id.* In short, the defendant's actions must justify a conclusion that it could reasonably anticipate being called into the courts of the forum state. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009).

The test for minimum contacts varies depending on whether the plaintiff's claims are related to the defendant's contacts with the forum state. *Lensing*, 417 S.W.3d at 156. If the claims are unrelated to the defendant's forum-state contacts, the plaintiff must rely on "general jurisdiction" over the defendant, and the minimum-contacts test requires the defendant to have continuous and systematic contacts with the forum. *Id.*; *see also PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 168–69 (Tex. 2007) (discussing general jurisdiction). If the claims arise from or relate to the defendant's forum-state contacts, the plaintiff may rely on

"specific jurisdiction," and the minimum-contacts test focuses on the relationship among the defendant, the forum state, and the litigation. *Lensing*, 417 S.W.3d at 156. Specific-jurisdiction minimum contacts are present if (1) the defendant has purposefully availed itself of the privilege of conducting activities in the forum state, and (2) there is a substantial connection between the defendant's forum contacts and the operative facts of the litigation. *Id.* Specific jurisdiction must be assessed on a claim-by-claim basis unless all of the plaintiff's claims arise from the same forum contacts. *See Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013).

## ANALYSIS

On appeal Suzlon India argues that the trial court erred when it denied its special appearance because it is not amenable to specific jurisdiction in this case.[3] Trinity alleged three causes of action against Suzlon India—breach of contract, tortious interference with contract, and promissory estoppel. We analyze Suzlon India's jurisdictional contacts on a claim-by-claim basis. *See Moncrief Oil*, 414 S.W.3d at 150.

### Breach of Contract

Trinity argues that Suzlon India had sufficient minimum contacts with respect to Trinity's breach-of-contract claim because Suzlon India "contracted with a Texas resident"—either (a) as a party to the Tower Agreement,[4] or (b) because Suzlon Wind was the agent of Suzlon India.

First, Trinity argues that Suzlon India is a party to the Tower Agreement "by direct execution of the agreement."[5] It is undisputed that P.C. Mehta, one of the three people who

---

[3] In the "issues presented" section of its appellant's brief Suzlon India lists a separate issue challenging the legal and factual sufficiency of the evidence to support certain fact findings and the trial court's "specific jurisdiction conclusions." This issue is woven into Suzlon India's argument about the trial court's conclusion that it is amenable to specific jurisdiction. We address the trial court's findings of fact and conclusions of law under the appropriate standard of review to the extent necessary to address the ultimate question of whether the trial court can exercise specific jurisdiction over Suzlon India in this case.

[4] In the trial court Trinity also argued that Suzlon Wind was the alter ego of Suzlon India. The trial court, however, made no reference to Trinity's alter ego theory in its findings of fact and conclusions of law, and Trinity does not argue alter ego on appeal. As a result, we do not address Trinity's alter-ego allegation in its petition.

[5] The trial court did not specifically find that Suzlon India was a party to the Tower Agreement. In its findings of fact the trial court stated only that "[i]t is alleged that Suzlon India is a party to the [Tower] Agreement."

signed the Tower Agreement on behalf of Suzlon Wind, and Nishish Shekdar, one of the three people who signed the second revision to the Tower Agreement on behalf of Suzlon Wind, were both employees of Suzlon India, not Suzlon Wind. These signatures, however, do not demonstrate that Suzlon India was a party to the Tower Agreement. The agreements state that they are between Trinity and Suzlon Wind, and directly above the signature lines for both Mehta and Shekdar the agreements expressly state that both men signed on behalf of Suzlon Wind, not Suzlon India. The agreements do not mention Suzlon India, nor do the agreements provide for Suzlon India to have any rights or obligations. And in his affidavit filed in support of Suzlon India's special appearance, Shekdar attests that Suzlon India was not a party to the Tower Agreement. As a result, we conclude that the undisputed evidence demonstrates that Suzlon India was not a party to the Tower Agreement.

Alternatively, Trinity argues that Suzlon Wind was the agent of Suzlon India. The trial court made the following findings in connection with Trinity's agency claim:

- Trinity made a *prima facie* showing that Suzlon Wind was acting on behalf of its principal Suzlon India, and in the course and scope of its agency, when it entered into and breached the Tower Agreement;

- Trinity made a *prima facie* showing that Suzlon India had the right to control both the means and details of Suzlon Wind's work;

- Trinity made a *prima facie* showing of Suzlon Wind's actual or apparent authority to act on behalf of Suzlon India; and

- Trinity made a *prima facie* showing that Suzlon India ratified Suzlon Wind's conduct.

On appeal Suzlon India argues that the evidence does not support these findings. We agree.

Agency is a consensual relation between two parties "by which one party acts on behalf of the other, subject to the other's control." *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 782–83 (Tex. App—Houston [1st Dist.] 2011, no pet.) (internal quotation omitted). Authorization to act and control of the action are the two essential

–6–

elements of agency. *Id.* at 783. A good faith belief on the part of a third party that an entity with whom it is dealing is the agent of another is not enough to bind the purported principal. *See id.* A principal is liable for the acts of another acting as its agent only when the agent has actual or apparent authority to do those acts or when the principal ratifies those acts. *Id.* An agent's authority to act on behalf of a principal depends on words or conduct by the principal either to the agent (actual authority) or to a third party (apparent authority). *Id.*

"[W]ell-settled law compels that Texas courts never presume that an alleged agency relationship exists." *Capital Fin. & Commerce AG v. Sinopec Overseas Oil & Gas, Ltd.*, 260 S.W.3d 67, 83 (Tex. App.—Houston [1st Dist.] 2008, no pet.). In order for a trial court to exercise personal jurisdiction over a nonresident defendant based on a plaintiff's allegation of agency, it is the plaintiff's burden to prove agency. *Id.*

To support its agency claim, Trinity again relies on the undisputed fact that Mehta and Shekdar, who signed the Tower Agreement and second revision on behalf of Suzlon Wind, were both employees of Suzlon India. As we explained above, however, the agreements expressly state that Mehta and Shekdar signed on behalf of Suzlon Wind, not Suzlon India. Their signatures on the agreements may constitute some evidence that Mehta and Shekdar were acting as agents of Suzlon Wind, but they do not prove that Suzlon Wind was the agent of Suzlon India.

Trinity also notes that Mehta attended one meeting between Trinity and Suzlon Wind sometime before the Tower Agreement was signed. But the only evidence of what occurred at that meeting is Shekdar's affidavit testimony that Mehta attended the meeting "only as a corporate courtesy to Suzlon India, so that Suzlon India was kept abreast and informed as to the contract Suzlon Wind was negotiating with Trinity." And Shekdar attests that "Mehta had no control or decision-making power in any negotiations concerning the [Tower] Agreement or any subsequent revisions."

Trinity also notes that Tulsi Tanti, the owner and chairman of Suzlon India, "came to Dallas, Texas, in 2010 and controlled a meeting with Trinity concerning the status of the [Tower] Agreement." Trinity's evidence of this meeting is the Cole affidavit, in which he states, "[I]n May 2010, a meeting concerning the status of the [Tower] Agreement was held in Dallas, Texas at the AWEA Show at the [Suzlon Wind] booth. I was present at this meeting as were several representatives of [Suzlon Wind]. Additionally, Tulsi Tanti, the President of Suzlon India, was present at this meeting. Mr. Tanti actually controlled the meeting on behalf of [Suzlon Wind]." In his affidavit, Shekdar describes the Dallas meeting as follows:

> Mr. Tulsi Tanti met with Trinity in 2010 in Dallas, Texas. However, Mr. Tulsi Tanti traveled to Dallas, Texas in 2010 to speak at the American Wind Energy Association ("AWEA") national wind conference about the current status and outlook of the global wind energy market, not to meet with Trinity. The AWEA conference is held annually in a city pre-selected by AWEA.

It is undisputed that the meeting in Dallas occurred after Suzlon Wind suspended its purchase of wind towers, and Trinity does not describe anything Tanti said or did at that meeting. Even assuming that Tanti controlled one meeting that occurred after Suzlon Wind suspended its purchase of wind towers, this does not prove that Suzlon India controlled Suzlon Wind's actions when Suzlon Wind executed, performed, and allegedly breached the Tower Agreement.

In addition, Trinity notes that according to Hewitt, someone from Suzlon India attended "at least six, possibly eight" meetings relating to the Tower Agreement. But Trinity does not describe anything that any employee of Suzlon India said or did at any of those meetings. And taken in context, Hewitt also testified that almost all of these meetings occurred after Suzlon Wind suspended its purchase of wind towers, because Suzlon India was working with the parties to try to find alternative placements for the wind towers. Evidence of Suzlon India's efforts to help the parties find alternative markets for the wind towers does not prove that Suzlon Wind

was the agent of Suzlon India when Suzlon Wind executed, performed, and allegedly breached the Tower Agreement.

We conclude that Trinity did not satisfy its burden to prove that Suzlon Wind acted as an agent for Suzlon India and that Suzlon India was subject to specific jurisdiction for that reason. *See, e.g.*, *Capital Fin. & Commerce*, 260 S.W.3d at 83.

In sum, the jurisdictional evidence demonstrates that Suzlon India did not contract with Trinity as a party to the Tower Agreement, and Trinity did not satisfy its burden to prove an agency relationship between Suzlon Wind and Suzlon India. As a result, we conclude that the trial court erred when it determined that Suzlon India has sufficient minimum contacts with Texas to support the trial court's exercise of specific jurisdiction with respect to Trinity's claim for breach of contract.

**Tortious Interference**

As an alternative to its claim for breach of contract, Trinity contends that Suzlon India tortiously interfered with the Tower Agreement. Trinity's specific allegation in connection with this claim is that Suzlon India pressured Suzlon Wind to cut Trinity's tower production in order to increase the production of towers at another company affiliated with Suzlon India known as SSL. To support this claim Trinity points to Winther's testimony about an email he sent to Hewitt in June 2009, in which Winther stated, "Furthermore, we are under constant pressure from Nishith Shekdar to increase the tower production at SSL and reduce the production at Trinity." Winther explained, however, that the pressure he was referring to in that email occurred during one meeting in India and there is no evidence to the contrary. Shekdar's conduct during a meeting in India would not support the exercise of personal jurisdiction over Suzlon India in Texas. As the Texas Supreme Court recently explained in an analogous case involving alleged tortious conduct in California that harmed a Texas resident, conduct occurring

–9–

elsewhere does not give rise to specific jurisdiction in Texas even if the defendant knew that the plaintiff would feel the effects in Texas:

> [A] nonresident directing a tort at Texas from afar is insufficient to confer specific jurisdiction. The focus is properly on the extent of the defendant's activities in the forum, not the residence of the plaintiff. Thus, [the defendants'] alleged tortious conduct in California against a Texas resident is insufficient to confer specific jurisdiction over [the defendants].

*Moncrief Oil*, 414 S.W.3d at 157 (citing *Michiana Easy Livin' Country*, 168 S.W.3d at 789–92).

To support its tortious interference claim, Trinity also cites Winther's testimony that he copied Shekdar on various emails at Hewitt's request. But Hewitt is an employee of Suzlon Wind, not Suzlon India. And it is only the actions of Suzlon India that are relevant to our inquiry. *See Lensing*, 417 S.W.3d at 156.

Finally, Trinity argues that Tanti's control of the meeting with Trinity in Texas at the 2010 AWEA conference is "ample evidence of intentional interference with contract occurring in Texas." We disagree. It is undisputed that the meeting in Texas occurred after Suzlon Wind instructed Trinity to stop manufacturing towers. Even if we assume Tanti controlled that meeting, Trinity does not say what Tanti said or did at that meeting to tortiously interfere with the contract. The only evidence of what occurred at the meeting is Hewitt's testimony that Tanti was trying to help Suzlon Wind and Trinity find other markets for the wind towers outside of the United States. In short, there is no evidence to demonstrate that the meeting in Texas is substantially related to the operative facts of Trinity's tortious interference claim. *See Lensing*, 417 S.W.3d at 156 (to support exercise of specific jurisdiction there must be a substantial connection between the defendant's forum contacts and the operative facts of the litigation).

In sum, the jurisdictional evidence demonstrates that Suzlon India did not have sufficient minimum contacts with Texas to support the trial court's exercise of specific jurisdiction with respect to Trinity's claim for tortious interference with contract. As a result, we conclude that

the trial court erred when it denied Suzlon India's special appearance with respect to Trinity's claim for tortious interference with contract.

**Promissory Estoppel**

As another alternative to its claim for breach of contract, Trinity alleged a claim against Suzlon India for promissory estoppel. In its live petition Trinity generally alleged the elements of a promissory estoppel claim, but it did not allege any specific promise made by Suzlon India. The trial court made three references to Trinity's promissory-estoppel claim in its findings of fact and conclusions of law: (1) "Suzlon India has been sued for . . . promissory estoppel"; (2) "[Trinity] has, under the facts presented, made a *prima facie* showing of [a] valid . . . promissory estoppel . . . claim[ ] against Suzlon India"; and (3) "With respect to the causes of action against it, Suzlon India has had minimum contacts with the state of Texas which are sufficient under Texas law to make Suzlon India constitutionally amenable to this Court's exercise of *in personam* jurisdiction."

In its appellee's brief Trinity explains that if its contract claim against Suzlon India is rejected because Suzlon India is not a party to the Tower Agreement, then it will seek to recover against Suzlon India in equity for the promises made under the Tower Agreement:

> [The] promises set out in the contract [ ] are exactly the actionable promises that will be under consideration should the contract be "otherwise unenforceable" against Suzlon India—the rationale for the promissory estoppel cause of action.

Trinity states that its alternative claim for promissory estoppel is "legally and factually supported in the record." But Trinity does not cite any evidence in the record or otherwise describe any of Suzlon India's contacts with Texas that relate to the operative facts of Trinity's alternative claim for promissory estoppel.

In his affidavit filed in support of Suzlon India's special appearance, Shekhdar states that Suzlon Wind and Suzlon India are separate and distinct entities, and that "[a]ll of the transactions

–11–

related to the [Tower] Agreement occurred between Suzlon Wind and Trinity." In other words, the promises set out in the Tower Agreement are promises of Suzlon Wind, not Suzlon India.

The jurisdictional evidence demonstrates that Suzlon India did not make a promise to Trinity in Texas, and it does not demonstrate that any of Suzlon India's contacts with Texas are substantially related to Trinity's equitable claim for promissory estoppel. As a result, we conclude that the trial court erred when it determined that Suzlon India had sufficient minimum contacts with Texas to support the trial court's exercise of specific jurisdiction with respect to Trinity's claim for promissory estoppel.

## CONCLUSION

We conclude that Suzlon India lacks sufficient minimum contacts to support the trial court's exercise of specific jurisdiction with respect to each of Trinity's claims. As a result, the trial court erred when it denied Suzlon India's special appearance. We reverse the trial court's order denying Suzlon India's special appearance and render judgment dismissing Suzlon India from this cause for lack of personal jurisdiction.


/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE


130798F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SUZLON ENERGY LIMITED, Appellant

No. 05-13-00798-CV        V.

TRINITY STRUCTURAL TOWERS, INC.,
Appellee

On Appeal from the 101st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-12-00094.
Opinion delivered by Justice Lang-Miers.
Justices O'Neill and Evans participating.

In accordance with this Court's opinion of this date, the trial court's order denying appellant Suzlon Energy Limited's special appearance is **REVERSED**. We **RENDER** judgment dismissing appellant Suzlon Energy Limited from this cause. It is **ORDERED** that appellant Suzlon Energy Limited recover its costs of this appeal from appellee Trinity Structural Towers, Inc.

Judgment entered this 17th day of June, 2014.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

–13–